LOEWENGART & CO.

v.

UNITED STATES.

C.D. 2405; Protest No. 60/21284.

United States Customs Court, First Division.

June 24, 1963.

577

Siegel, Mandell & Davidson, New York City (Joshua M. Davidson and David Serko, New York City, of counsel), for plaintiff.

John W. Douglas, Asst. Atty. Gen. (Alfred A. Taylor, Jr., and Mollie Strum, trial attys., New York City), for defendant.

Sharretts, Paley & Carter, New York City (Eugene F. Blauvelt, New York City, of counsel), as amicus curiae.

Before OLIVER, Chief Judge, and WILSON, Judge.

WILSON, Judge.

The merchandise in this case consists of a quantity of India-tanned goatskins, which had been subjected to a tanning process in India before exportation. The imported skins were classified under the provisions of paragraph 1530(c), Tariff Act of 1930, as "vegetable-tanned rough leather made from goat or sheep skins (including those commercially known as India-tanned goat or sheep skins)" and assessed with duty at 10 per centum ad valorem. The plaintiff protests the classification and claims that the merchandise is properly free of duty under the provisions of paragraph 1765 of the Tariff Act of 1930 as "Skins of all kinds, raw, and hides not specially provided for."

It is agreed that the issue in this case is whether the India-tanned goatskins, in their imported condition, consist of vegetable-tanned rough leather (including those commercially known as In-dia-tanned goat or sheep skins), properly classifiable under paragraph 1530(c) of the Tariff Act of 1930, or whether they should be classified as raw skins, duty free, under paragraph 1765 of the tariff act.

The record in this case is voluminous, consisting of approximately 900 pages, including the pretrial record and the briefs. However, much of the testimony is repetitious. In substance, the witnesses for the plaintiff testified that, although the merchandise before the court is commercially known as India-tanned goatskins (R. 111–112; 139–141; 161; 174), yet, it is not vegetable-tanned rough leather, but still raw hides or skins. The reason given by plaintiff's witnesses for this opinion is that the processes to which the skins were subjected in India (R. 26–49) before exportation consisted only of such treatment as was essential for the preservation of the merchandise for transportation to the United States; that the tanning procedures followed in the treatment of the skins served only to preserve them and not to tan or convert them permanently into leather. The witnesses stated that the India-tanned goatskins in this case, in their imported condition, were not usable as leather, but that they had to be "stripped," so as to remove therefrom all the materials which had been applied to them before their shipment from India, and that such stripping was for the purpose and had the effect of returning these skins to a completely raw state, and that, from said raw state, they were tanned into leather in this country. On the other hand, the defendant's witnesses testified definitely that the imported skins consisted of In-dia-tanned goatskins, which had been converted into rough leather, and that the tanned skins could not, by the stripping process described by plaintiff's witnesses, be returned to the raw state. Without exception, defendant's witnesses testified that the treatment to which the goatskins were subjected in India constituted a definite tanning process, by which the skins were permanently converted into rough leather, and was

not, as stated by plaintiff's witnesses, a mere preservative process having no permanent effect on the skins.

Plaintiff's exhibits 1–A, 1–B, and 2, introduced in evidence as representative of the India-tanned goatskins before the court, clearly have the appearance of leather and not that of raw skins. An examination of these exhibits, in the opinion of the court, supports the testimony of witnesses for the defendant, rather than that given by plaintiff's witnesses. Dr. Donald F. Holloway, a witness called by the defendant, was outstanding in his qualifications as an expert on the questions of tanning and leather. Dr. Holloway, a partner in the R. & M. Industrial Laboratories, Peabody, Mass., received a B.S. degree in chemistry from M.I.T. in 1938 and, in 1941, a doctor's degree in chemistry from the same institution. He is a member of the American Leather Chemists Association and the American Chemical Society. Since 1941, he has worked as a consultant in the manufacture of leather, having done work for such companies as John J. Riley Co.; Cummings Leather Co.; the Allied Kid Co., Specialty Division; the Brezner Tanning Corp.; Wind Welting & Innersole Co.; and others (R. 232–235).

On the question of tanning materials, tanning processes, and the making of rough leather, Dr. Holloway testified as follows:

"Q. Do all recognized vegetable tanning materials contain a common ingredient?—A. They do contain a common ingredient.

"Q. What is that ingredient?—A. The word in the trade is "tannate," but to the layman the expression is "tannin."

"Q. Would you please describe, briefly, some of the common properties of tannin?—A. Well, all tannins have the ability to affix to leather substance, to hide substance, in order to make leather. There are other characteristics about them, too. They are generally brown in color. They are called vegetable tanning materials because they occur in the seeds, the fruits, the wood, or the bark of various growing things. All tannins, in general, produce a coloration with iron, which is well-known, to make ink. All tannins have an effect on leather. All tannins are astringent, which would be evidenced by the fact that if they're put on the tongue, they pucker the tongue; and they all have the ability to convert hide substance, or a raw skin, into leather.

"Q. Now, Dr. Holloway, I read to you a definition of rough leather, which the United States Court of Customs Appeals adopted in its opinion way back in 1911, in United States v. Robertson, 1 CCA, 379, on page 380, and ask whether you are today, 50 years later, in agreement with it, or not.

\* \* \* \* \* \*

"Rough leather, as understood by the trade, was such leather as had been tanned and unhaired, and not given any further finishing treatment. It was thus contradistinguished from dressed or finished leather.

"The first process, generally stated, in the treatment of hides is to tan them, which also includes unhairing them. Before the hides are tanned they are not called leather at all; when they are once tanned they become leather. When only tanned and unhaired they are rough leather. When such leather is afterwards finished and dressed by other processes, it ceases to be rough leather.

"Q. Do you agree with that statement?

\* \* \* \* \* \*

"A. Yes.

"Q. In your opinion, does that statement with which you agree embrace vegetable-tanned rough leather made of goatskins?—A. Yes, it does.

"Q. Now, Dr. Holloway, do the vegetable tanning materials employed in tanning leather affect any change in the skins to which they are applied?

\* \* \* \* \* \*

"A. Yes, they do affect a change.

"Q. Please describe the change. —A. This change is to convert the raw skin into leather. There are a number of ways the change can be observed. Do you want me to describe the ways?

"Q. Yes.—A. Well, there are a number of ways that one can see the change. If one has a piece of leather to look at, as compared to the raw skin, one sees, first, that the hair is removed; one, that it has a grain on it; second, that the leather now has become supple—it has a certain elongation to it that it does not have as a raw skin. It has a stretch to it that it does not have as a raw skin. It also, in the case of vegetable leather, if we work it mechanically, it has a squeak, which raw skin does not have.

"JUDGE MOLLISON: By that, do you mean vegetable-tanned—

"THE WITNESS: Tanned with vegetable materials, yes. I'm confining myself to vegetable-tanned leather. There are other chemical tests that the chemist, or leather technician uses, to evaluate what effect the tannin has on leather. There are two particular tests; one is the shrinkage temperature of the leather; the other is the degree of tannage of the leather. These are two ways in which chemists measure the result, quantitatively.

"JUDGE MOLLISON: Is there any physical change in the skin when it is tanned?

"THE WITNESS: It physically changes, yes. Actually, it becomes increased in volume, for one thing. It becomes stable to putrefaction. The other thing is that it becomes stable to drying and wetting. It has completely changed from its original state.

"Q. Now, is the change which has been effected a permanent one?—A. The change is a permanent one, yes. As a matter of fact, there have been leathers discovered, vegetable-tanned leather specifically, from 10,000 B.C., which have been analyzed, and are still identifiable as leather, and there have been vegetable-tanned materials many, many years ago." [R. 239–243.]

Dr. Holloway expressed the unqualified opinion that the representative samples of India-tanned goatskins (plaintiff's exhibits 1–A, 1–B, and 2) are rough leather and not raw skins. He had previously subjected the samples of the skins to chemical and shrinkage tests.

The plaintiff contends that the decision of this court, in the case of Nawi Noonoo & Co. et al. v. United States, 39 Cust.Ct. 57, C.D. 1904, is controlling in the instant case. While it is true that, in the Nawi Noonoo case, the court held that certain goatskins and sheepskins were not "vegetable-tanned rough leather made from goat or sheep skins," dutiable under paragraph 1530(c), Tariff Act of 1930, but were properly classifiable as raw skins, duty free, under paragraph 1765 of the tariff act, yet, the facts in the Nawi Noonoo case were not the same as, or even similar to, the facts in the present case. In the case now before us, it clearly appears from the testimony that the goatskins under consideration (represented by plaintiff's exhibits 1–A, 1–B, and 2) are known in the trade and commerce of the United States as "India-tanned goatskins," or, interchangeably, as "East India-tanned goatskins." In the Nawi Noonoo case, it was "admitted by the Government that none of the merchandise involved" was India-tanned (pretrial order, paragraph 5; R. 3). Furthermore, the process followed in treating the raw skins before exportation was entirely different from the tanning to which India-tanned goatskins were subjected in the present case. (See Nawi Noonoo record, page 9, and following.)

As a matter of fact, the skins, in the Nawi Noonoo case, were described as raw skins (R. 26). In that case, exhibit 3 (an India-tanned goatskin) was received in evidence, without objection, as representative of "India-tanned vegetable-tanned rough leather," and was described by plaintiffs' witnesses as India-tanned rough leather. (Nawi Noonoo record, page 32, and following.) The witnesses, in the Nawi Noonoo case, also testified that the merchandise in that case, as imported, was not leather and could not be used for any purpose as leather. (See record 36 and following.)

In the cited case, the Government offered no evidence, so the decision was based upon the uncontradicted testimony of plaintiffs' witnesses. The decision of the court was based upon the factual finding from the evidence presented that the involved skins had not been converted into leather and were not usable for leather purposes, and were not vegetable-tanned rough leather for tariff purposes, but raw skins. The Nawi Noonoo case is, therefore, in no way controlling or even applicable in the present case.

The exhibits before the court (plaintiff's exhibits 1–A, 1–B, and 2) meet the requirements of the definitions for leather and tanning given in Webster's New International Dictionary, second edition, unabridged, 1956, wherein such terms are defined as follows:

"leather * * * The skin of an animal, or some part of such skin, tanned, tawed, or otherwise dressed for use, to render it resistant to putrefaction and relatively soft and flexible when dry; also, dressed hides, collectively.

"tan * * * 1. To convert (skin) into leather by impregnation with an infusion of oak bark or some other form of tannin, or a substitute, or, in an extended sense, by any process. Tanning proper results in the absorption and, probably, the combination of the tanning agent with the constituents of the derma, or corium, which is rendered tougher, less permeable, and nonputrescible. **Vegetable tanning** (with plant infusions) is now chiefly used for heavy leather (as sole leather and belting) and the more rapid **mineral tanning** (with metallic salts) for lighter leathers (as shoe uppers and glove kid). The most important mineral process is **chrome tanning,** in which the skin is impregnated with chromium salts, but **tawing** (treatment with alum, salt, etc.) is also practiced (esp. for glove kid). Chamois is the product of **oil tanning** (in which oil is used instead of tannin, etc.). Before tanning, the hides or skins are soaked, limed, unhaired, delimed, and washed; after tanning the leather is dried, staked, and dressed, and often also dyed.

"taw * * * 2. To prepare with alum, as skins of sheep, lambs, goats, and kids, for gloves, etc., by imbuing them with alum, salt, and other agents as an emulsion of egg yolk. Tawing is a form of mineral tanning.

"tannin, 1.a An amorphous, strongly astringent substance obtained in the form of brownish-white shining scales from gallnuts (of which it constitutes 50 per cent or more), sumac, valonia, and other plant products;—called also *tannic acid, gallotannin, gallotannic acid.* It precipitates gelatin solutions, tans hides, and forms a bluish-black compound with ferric salts. * * * It is used in tanning, making ink, dyeing, etc., and in medicine as an astringent. * * * 2. Any substance that has a tanning effect, as determined by its absorption by hide powder; a tan."

The court is of the opinion that the plaintiff has failed to prove its contention that the merchandise in question consists of raw skins, entitled to admission duty free under the provisions of paragraph 1765 of the Tariff Act of 1930. The court is rather of the opinion that the evidence, taken as a whole, by

great preponderance, supports the collector's classification of the India-tanned goatskins at 10 per centum ad valorem under paragraph 1530(c) of the tariff act.

 There is an additional persuasive reason for finding that the India-tanned goatskins involved are properly classifiable under paragraph 1530(c) of the tariff act, whether rough leather or not. The legislative history of this provision of the Tariff Act of 1930 indicates that, when the Congress enacted that provision, it intended specifically to place goatskins, commercially known as India-tanned goatskins, under paragraph 1530 (c) of the act. Under the Tariff Act of 1922, vegetable-tanned rough leather made from goat or sheepskins came in duty free under the provisions of paragraph 1606, which applied to "All leather not specially provided for." Paragraph 1431 of the Tariff Act of 1922 covered dressed and finished sheep, goat, and calf leather. In 1929, the Congress was studying the revision of the tariff act preparatory to the enactment of the new law of 1930. The House of Representatives passed H.R. 2667, which contained the following paragraph:

"[PAR. 1530(c)]. Leather (except leather provided for in subparagraph (d) of this paragraph), made from hides or skins of animals (including fish, reptiles, and birds, but not including cattle of the bovine species), in the rough, in the white, crust, or russet, partly finished, or finished, 25 per centum ad valorem * * *."

However, the bill, as enacted by the House, was referred to the Senate Finance Committee, which held extensive hearings (see Hearings, Committee on Finance, United States Senate, on H.R. 2667, 71st Congress, 1st session, volume 15, page 572). Among other witnesses to appear before the committee was one Louis M. Musliner, referred to as representing a committee of fancy leather tanners. This witness testified that his group desired the rate of duty of 25 per centum provided for in the House bill reduced to 10 per centum. He gave the following reasons:

"* * * The skins that I was talking about were India tanned goat and sheep skins. These skins are used in the fancy leather trade and have always been used in the fancy leather trade ever since this class of leather was made. There is no other source of supply. There is no other country in the world that makes them. You could not get the same results if you took the raw skins and tanned them anywhere else. It has been tried in all countries. The East Indian tanners use their own tanning material, they use their own methods, they use berries and barks and different things—vegetable oils —that we cannot get."

Mr. Musliner requested that H. R. 2667 be amended to include the following language:

"* * * vegetable-tanned rough leather made from goat and sheep skins (including those commercially known as India-tanned goat and sheep skins) * * * 10 per centum ad valorem."

Mr. Musliner was questioned by Senators Couzens and Walsh and asked to explain further his position. The following is taken from the record:

[Musliner replied]: "It puts a duty of 10 per cent on India-tanned goat and sheep skins, which [are] now free under the present law. * *

"Senator COUZENS. I understand, but you say that it is all coming in free now?

"Mr. MUSLINER. It is all coming in free now.

"Senator COUZENS. Whether tanned or raw?

"Mr. MUSLINER. Yes; whether tanned or raw, but not finished. On finished there is a duty of 20 per cent. * * *

* * * * * *

"Senator COUZENS. In other words, you are asking for a reduc-

tion in the bill passed by the House? [R. 573.]

"Mr. MUSLINER. Only on this India-tanned goat and sheep. You see, this India-tanned goat and sheep does not conflict with anything that is made here. Nothing like it is made or can be made here."

In a brief filed on behalf of the Fancy Leather Tanners of the United States for the Senate Committee, the following appears:

"REASONS FOR REQUESTING WORDING CHANGE

"Certain inequalities exist in the present tariff bill as passed by the House which would have a ruinous effect on the fancy-leather-tanning industry if unchanged. Subparagraph (c) of paragraph 1530, as worded in the present bill, places a duty of 25 per cent on vegetable-rough-tanned goat and sheep skins, which are commercially known in the tanning trade as India-tanned goat and sheep skins. These India-tanned goat and sheep skins are used by the fancy leather tanners as raw material and are regarded by them in the same light as raw or untanned hides and skins are regarded by other tanners. When these skins are received by the fancy-leather-tanner, they have been treated by a native East Indian tanning process. These skins are washed out by the American tanner and then put through a regular retanning process."

Following the recommendations of the Fancy Leather Tanners, the language proposed by them was included in paragraph 1530(c) of the Tariff Act of 1930 as finally passed.

It seems clear, therefore, that, in enacting paragraph 1530(c) of the Tariff Act of 1930, the Congress intended to include goatskins, commercially known as India-tanned goat, among the items dutiable at 10 per centum ad valorem.

For the reasons hereinbefore stated, the protest is overruled. Judgment will be entered accordingly.